Case No. 21-6108

# UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

COMMONWEALTH OF KENTUCKY, and

STATE OF TENNESSEE

*Plaintiffs-Appellees*

v.

JANET YELLEN,
in her official capacity as
Secretary of the Treasury, et al.

*Defendants-Appellants*

---

On Appeal from the United States District
Court for the Eastern District of Kentucky
Case No. 3:21-cv-00017

---

## RESPONSE OF THE COMMONWEALTH OF KENTUCKY
## AND THE STATE OF TENNESSEE TO PETITION
## FOR REHEARING EN BANC

---

Daniel Cameron
 *Attorney General of Kentucky*
Matthew F. Kuhn
 *Solicitor General*
Michael R. Wajda
 *Assistant Solicitor General*

Office of the Kentucky
Attorney General
700 Capital Avenue, Suite 118
Frankfort, Kentucky 40601
(502) 696-5300
Matt.Kuhn@ky.gov
Michael.Wajda@ky.gov

Jonathan Skrmetti
 *Attorney General and Reporter of Tennessee*
Andrée S. Blumstein
 *Solicitor General*
J. Matthew Rice
 *Special Assistant to the Solicitor General*

Office of the Tennessee
Attorney General
P.O. Box 20207
Nashville, Tennessee 37202
(615) 741-3492
Andree.Blumstein@ag.tn.gov
Matt.Rice@ag.tn.gov

# TABLE OF CONTENTS

TABLE OF AUTHORITIES..................................................................................ii

INTRODUCTION ...........................................................................................1

BACKGROUND .............................................................................................3

ARGUMENT ..................................................................................................7

    I.    The panel decision is correct on the merits.................................7

      A.    Every appellate court to reach the merits has correctly found the Tax Mandate impermissibly vague under *Pennhurst*. ..........................................8

      B.    The panel correctly found that the Tax Mandate is impermissibly vague and cannot be saved by Treasury's regulation. ..........................................14

      C.    The Treasury Defendants chose not to question the States' cause of action..........................................17

CONCLUSION ..............................................................................................18

CERTIFICATE OF COMPLIANCE .................................................................19

CERTIFICATE OF SERVICE ........................................................................20

# TABLE OF AUTHORITIES

## Cases

*Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*,
548 U.S. 291 (2006) ................................................................. 9

*Cutter v. Wilkinson*,
423 F.3d 579 (6th Cir. 2005) ................................................ 14

*Dep't of Revenue of Oregon v. ACF Indus., Inc.*,
510 U.S. 332 (1994) ................................................................. 1

*Kentucky v. Yellen*,
54 F.4th 325 (6th Cir. 2022) .......................................... *passim*

*McWilliams v. Dunn*,
582 U.S. 183 (2017) ................................................................. 7

*Pennhurst State Sch. & Hosp. v. Halderman*,
451 U.S. 1 (1981) ......................................................... 9, 13, 16

*Sch. Dist. of City of Pontiac v. Sec'y of Dept. of Educ.*,
584 F.3d 253 (6th Cir. 2009) (en banc) ............................... 10

*West Virginia ex rel. Morrissey v. U.S. Dep't of Treasury*,
59 F.4th 1124 (11th Cir. 2023) ...................................... *passim*

## Statutes

42 U.S.C. § 802 ......................................................... *passim*

## Regulations

31 C.F.R. § 35.4(a) ................................................................. 11

## Rules

6th Cir. I.O.P. 35(a) ................................................................. 2

Coronavirus State and Local Fiscal Recovery Funds, 87 Fed. Reg. 4,338
(Jan. 27, 2022) ....................................................................... 12

**Other Authorities**

Treasury Secretary and Federal Reserve Chair Testimony on COVID-19
Economic Recovery, https://www.c-span.org/video/?510059-1/treasury-
secretary-federalreserve-chair-testimony-covid-19-economic-recovery
(Mar. 24, 2021) ............................................................................................... 5

## INTRODUCTION

To help States cope with a once-in-a-century pandemic, the federal government offered the States "a sum equal to one-fifth of their annual budgets." *Kentucky v. Yellen*, 54 F.4th 325, 329 (6th Cir. 2022). But this money came with a catch. The federal government demanded that the States forsake their taxing authority to receive this money—authority that is "central to state sovereignty." *Dep't of Revenue of Or. v. ACF Indus., Inc.*, 510 U.S. 332, 345 (1994). The Tax Mandate requires the States not to use the federal money to "either directly or indirectly offset a reduction in the net tax revenue of such State resulting from a change" in state law. 42 U.S.C. § 802(c)(2)(A).

Because all money is fungible, this raised "thorny questions." *Kentucky*, 54 F.4th at 331. A unanimous panel of this Court found the Tax Mandate impermissibly vague in three respects. First, the Tax Mandate "does not clearly explain what it means to 'indirectly offset' revenue-reducing tax cuts." *Id.* at 348. Conceivably, any time a State "enacts a revenue-reducing tax cut and expends" Rescue Plan funds, those funds "indirectly offset" a revenue-reducing tax cut. *Id.* Second, the Tax Mandate offers no method to identify a "reduction" in state tax revenue. *Id.* at 350. And it is simply impossible to calculate a reduction without a baseline.

1

*Id.* Finally, the States cannot determine whether "a reduction in tax revenue '*result*[*ed*] from a change' in state tax policy." *Id.* at 351 (alteration in original) (citing Tax Mandate). The Tax Mandate does not say whether it is concerned with "*expected* tax revenues," which a State can control and forecast, or "*actual* tax revenues," which are known only after the fact. *Id.*

The Treasury Defendants seek en banc review. After submitting to the panel a 15-page opening brief focused almost entirely on jurisdiction, Appellant Br. 6–11, the Treasury Defendants have now decided to focus on the merits. Rehearing should be denied. There is no precedent-setting error of exceptional importance. Nor is there a direct conflict with Supreme Court or Sixth Circuit precedent. 6 Cir. I.O.P. 35(a). In fact, the only other circuit court to address the constitutionality of the Tax Mandate unanimously agrees with the panel's decision. *West Virginia ex rel. Morrissey v. U.S. Dep't of Treasury*, 59 F.4th 1124, 1146 (11th Cir. 2023).

The Tax Mandate's vagueness issues underscore the need for finality and the undesirability of protracted en banc review. The panel noted the ongoing harm of "expend[ing] resources to maintain compliance with the Offset Provision." *Kentucky*, 54 F.4th at 342. Because the funding from the Tax Mandate expires on December 31, 2024, 42 U.S.C. § 802(a)(1), the States need finality as they

expend the funds subject to the Tax Mandate. Absent finality, the States will lack the certainty they need.

Merits aside, the Treasury Defendants do not disclaim pressing their jurisdictional arguments again if the full Court grants review. Pet. 2 n.1. So although the Treasury Defendants ask the full Court to resolve the constitutionality of the Tax Mandate, the Court would likely have to first sort through (meritless) jurisdictional arguments about which the Treasury Defendants chose not to seek rehearing. As a result, the Treasury Defendants seek rehearing only about merits issues they may well ask the full Court to avoid on jurisdictional grounds.

## BACKGROUND

The American Rescue Plan Act provides the States with almost two-hundred billion dollars to combat the effects of COVID-19. But to receive the funds, the States must agree to an incomprehensible condition that effectively prohibits them from lowering their taxes.

**Rescue Plan Funding.** The States can spend their Rescue Plan funds on four broad categories of COVID-19-related expenses. 42 U.S.C. § 802(c)(1). First, the States can use the money to provide assistance to several groups and industries affected by the pandemic—households, small businesses, nonprofits, etc. *Id.* § 802(c)(1)(A). Second, the States can fund salary increases for employees "that

are performing . . . essential work." *Id.* § 802(c)(1)(B). Third, the States can use Rescue Plan funds to make up for any revenue losses caused by the pandemic. *Id.* § 802(c)(1)(C). And fourth, the States can make "investments in water, sewer, or broadband infrastructure." *Id.* § 802(c)(1)(D). The Rescue Plan funds can be used only on these four categories and only "to cover costs incurred by the State . . . by December 31, 2024." *Id.* § 802(c)(1).

**The Tax Mandate.** It is not enough, however, that the States spend their Rescue Plan funds only in approved areas. The Rescue Plan also requires the States to refrain from lowering their taxes during any of the years they spend the federal money.

The Rescue Plan accomplishes this through an impossibly vague restriction on how the States "use" their funds—the Tax Mandate. Under § 802(c)(2)(A), the States are prohibited from using Rescue Plan funds to "directly or indirectly offset a reduction in [their] net tax revenue" caused by "a change in state law, regulation, or administrative interpretation." In other words, if the States change their tax laws in a way that lowers the tax burden on their citizens, the Rescue Plan prohibits the States from using federal funds to "indirectly" offset any revenue losses.

But the statute does not define what it means to "indirectly" offset a loss in tax revenue. Nor does it identify the starting point from which the States must

measure any reduction in their "net tax revenue," or even whether the revenue reduction is expected or actual. Those critical items are left to the imagination. And when a group of States sought clarity, Secretary Yellen herself admitted that the fungibility of money raised "thorny questions" about what the Tax Mandate means.[1]

**This lawsuit.** Facing imminent harm, the Commonwealth of Kentucky and the State of Tennessee sued the Treasury Defendants to prevent them from enforcing the Tax Mandate. [Compl., R.1, PageID#1–25]. The States challenged the Tax Mandate on two fronts. First, the States argued that the Tax Mandate violates the Spending Clause, which prohibits Congress from imposing ambiguous or coercive conditions on federal funds. The Tax Mandate is both. Second, the States argued that the Tax Mandate violates the anti-commandeering doctrine by using Congress's spending authority to co-opt an essential feature of State sovereignty—the power to set state tax policies.

---

[1] Treasury Secretary and Federal Reserve Chair Testimony on COVID-19 Economic Recovery at 58:20–59:03, https://www.c-span.org/video/?510059-1/treasury-secretary-federalreserve-chair-testimony-covid-19-economic-recovery (Mar. 24, 2021).

Upon cross-motions on all claims, the district court entered summary judgment in the States' favor. The court held that the Tax Mandate is unconstitutionally coercive. [Op. & Order, R.42, PageID#628, 632–39]. The court explained that "the federal government overstep[ped] its bounds" by "unduly influenc[ing] the States' power to set their own tax policies" during the COVID-19 pandemic. [*Id.* at PageID#639]. Because "[t]he spending power of the federal government does not go so far," [*id.* at PageID#628], the district court entered a permanent injunction prohibiting the defendants from enforcing § 802(c)(2)(A) against Kentucky and Tennessee, [*id.* at PageID#644].

**The appeal.** Upon the Treasury Defendants' appeal, the panel unanimously affirmed the permanent injunction as to Tennessee because it found the Tax Mandate impermissibly vague in three respects.[2] First, the Tax Mandate does not establish "what particular conduct constitutes an 'indirect' offset." *Kentucky*, 54 F.4th at 347. Second, it gives no notice about "how to calculate a 'reduction'

---

[2] As to Kentucky, the panel concluded over Judge Nalbandian's dissent that Kentucky's challenge to the Tax Mandate was moot. *Kentucky*, 54 F.4th at 329. Kentucky respectfully disputes that conclusion and intends to challenge it if rehearing is granted. After all, the Eleventh Circuit disagreed with the panel on this very issue. *West Virginia*, 59 F.4th at 1139 ("We disagree with this reasoning."). Even still, "the relief granted to Tennessee applies to Kentucky regardless." *Kentucky*, 54 F.4th at 358 n.1 (Nalbandian, J., concurring in part and dissenting in part).

in net tax revenue." *Id.* And third, it provides States no clarity as to "whether such a reduction resulted from a tax cut." *Id.* The Treasury Defendants now seek en banc review.

## ARGUMENT

After offering only a tepid defense of the merits before the panel, the Treasury Defendants now wish to contest the merits more vigorously. The Court should reject this request. The panel decision is demonstrably correct on the merits. It also aligns with the only other circuit court to consider the issue. *Kentucky*, 54 F.4th at 354; *West Virginia*, 59 F.4th at 1146. In addition, if rehearing is granted, the Treasury Defendants have indicated that they may again press the jurisdictional arguments they lost at the panel stage. Pet. 2 n.1. The Court should not grant rehearing to give the Treasury Defendants a second bite at their jurisdictional arguments—on which they do not seek rehearing.[3]

### I.    The panel decision is correct on the merits.

The Treasury Defendants claim that the panel decision "rests on errors of law." Pet. 6. They purport to identify four. First, the Treasury Defendants take

---

[3] This is akin to a litigant who "persuaded us to grant certiorari on one question" and then "chose to rely on a different argument in their merits briefing." *McWilliams v. Dunn*, 582 U.S. 183, 210 (2017) (Alito, J., dissenting) (citation omitted). The Court should "not tolerate this sort of bait-and-switch tactic." *Id.* at 211.

7

issue with the panel citing *Pennhurst* to find the Tax Mandate impermissibly vague. *Id.* Next, they argue that the Tax Mandate is clear. *Id.* at 10. After that, they say that Congress can allow agencies to cure fatal ambiguities through regulations. *Id.* at 12. And finally, they suggest in passing that the States lack a cause of action. *Id.* at 9. Each of these arguments fails; rehearing should be denied.

### A. Every appellate court to reach the merits has correctly found the Tax Mandate impermissibly vague under *Pennhurst*.

Start with the clear-statement principle from *Pennhurst*. According to the Treasury Defendants, *Pennhurst* can be used only "to resolve disputes over the meaning of grant conditions in a grant recipient's favor." Pet. 6. It is "not a basis to declare a federal statute categorically unenforceable." *Id.* They claim that "[o]ther than in this and other challenges" to the Tax Mandate, "no court of which we are aware has *ever* relied on the *Pennhurst* clear-statement principle" to hold a funding condition "categorically unenforceable." *Id.* at 8.

As an initial matter, Congress has never used such facially vague language to take such a large bite out of the States' sovereignty. Nor did the panel break new ground in its application of *Pennhurst*. Like many prior cases, the panel recognized that Spending Clause legislation is "unenforceable . . . when [Congress] fail[s] to provide states with clear notice of a purported funding condition." *Kentucky*, 54 F.4th at 347. In this case, though, the statutory language is not simply

8

ambiguous, such that the clear-statement rule forecloses a plausible interpretation at the periphery. Here, the statutory language is meaningless without further explication. That is, the language is so vague as to have no clear meaning at all. The *Pennhurst* clear-statement rule does not somehow disappear in such circumstances; it operates at its zenith in protecting States.

Moreover, the Treasury Defendants' qualification to the alleged lack of case law—excluding "this and other challenges" to the Tax Mandate—performs herculean work. So far, every appellate court to reach the merits of the several challenges to the Tax Mandate has found it impermissibly vague. All six of the circuit judges to consider the issue agree.

The unanimous panel here noted that Congress' Spending Clause authority "rests on whether the State voluntarily and knowingly accepts the terms of the 'contract.'" *Kentucky*, 54 F.4th at 348 (citing *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981)). And the States "cannot knowingly accept conditions of which they are 'unaware' or which they are 'unable to ascertain.'" *Id.* (citing *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006)). So for Congress to impose a condition, "'it must do so unambiguously' and with a 'clear voice.'" *Id.* (citing *Pennhurst*, 451 U.S. at 17).

In fact, the panel understood the *Pennhurst* clear-statement rule the same

way this Court did in the en banc case the Treasury Defendants cite. *Compare id.* at 348 (describing clear-statement rule), *with Sch. Dist. of City of Pontiac v. Sec'y of Dep't of Educ.*, 584 F.3d 253, 268 (6th Cir. 2009) (en banc) (Cole, J., opinion in favor of reversing) (describing clear-statement rule the same way), *and id.* at 284 (Sutton, J., concurring in the order) (describing it the same way). All agree that an unascertainable funding condition cannot be knowingly accepted. The difference in *Pontiac* is that the condition was ambiguous, not vague, and the opinions interpreted the ambiguous condition differently. *See Kentucky*, 54 F.4th at 346–47 (explaining that the Tax Mandate is vague because it "lacks inherent or definite content"). And the Treasury Defendants misread Judge Cole's opinion, which referenced the States' obligation to follow the *other* unambiguous funding conditions—not the condition he found ambiguous. *Pontiac*, 584 F.3d at 278 (Cole, J., opinion in favor of reversing). The analogy here is that the States must still spend Rescue Plan funds only in the enumerated categories—which the States have never contested. 42 U.S.C. § 802(c)(1).

At any rate, Congress failed to speak with the requisite clarity here. As the panel noted, the phrase "indirectly offset" "failed to provide clear notice" about the prohibited conduct. *Id.* at 350. When money is fungible, what does it mean to "indirectly offset"? Consider the States' example from briefing. Appellee Br. 35.

Say a State currently spends $10 million on healthcare infrastructure and $10 million on its corrections department. It necessarily collects $20 million in revenue. *Kentucky*, 54 F.4th at 337 n.5 (noting balanced-budget requirements). And say the State receives $2 million in Rescue Plan funding, which it spends on healthcare infrastructure. It then puts $2 million that it formerly spent on healthcare infrastructure toward new line-items for its corrections department. And then it reduces its prior corrections-department budget by $1 million. With this $1 million, it enacts a tax cut of the same amount. So now, the State spends $10 million on healthcare infrastructure and $11 million on corrections, collects $21 million in revenue ($2 million of which are Rescue Plan funds), and provided a $1 million dollar tax cut. Does this violate the Tax Mandate? On the one hand, the State reduced its corrections-department budget to provide the tax cut. On the other hand, the State could not have done so but for the $2 million in Rescue Plan funds.

The takeaway is that the Tax Mandate offers *no* way for a State to know. It can only rely on the Treasury Defendants' whims.[4] For this reason, the Tax

---

[4] The Final Rule makes no difference to this analysis because it expressly reserves the Secretary's authority to enforce the Tax Mandate regardless of the Final Rule's provisions. 31 C.F.R. § 35.4(a).

Mandate fails to provide the "clear notice" required for the federal government to impose such a condition. *Kentucky*, 54 F.4th at 350.

Of course, other provisions are hopelessly vague too. What does it mean for something to cause "a reduction" in net tax revenue? A "'reduction' can be assessed only be comparing two amounts." *Id.* (citing Coronavirus State and Local Fiscal Recovery Funds, 87 Fed. Reg. 4,338, 4,426 (Jan. 27, 2022)). Not only does this lack of a baseline make this provision entirely indeterminate—since something cannot be compared against nothing—but Congress also specified a 2019 baseline elsewhere without specifying one here. *Id.* And normally when Congress writes two provisions differently, courts presume such a distinction matters. *Id.* at 351 n.18.

Finally, the Tax Mandate offers no method to determine whether that comparison-less reduction "*result*[*ed*] from a change" in state tax policy. *Id.* at 351 (alteration in original) (citing Tax Mandate). What if the State forecasts no "reduction in *expected* tax revenues," but winds up with a "reduction in *actual* tax revenues"? *Id.* The Final Rule, "surprisingly," suggests that the answer "hinges on whichever accounting method a state uses to determine the effect of the tax cut." *Id.* at 352 (citing Final Rule, 87 Fed. Reg. at 4,406–07). But again, "how were the States supposed to know about these critical points based on the [Tax Mandate]

12

alone?" *Id.* The panel opinion is replete with examples to which the Tax Mandate offers no guidance. And because the Tax Mandate does not provide "'clear notice' about the measures required to maintain compliance," the provision must fall. *Id.* at 352 & n.20.

The Eleventh Circuit panel also unanimously found the same impermissible vagueness. That panel first cited the same precedent requiring that Congress "speak 'unambiguously' and 'with a clear voice' when it imposes conditions on federal funds." *West Virginia*, 59 F.4th at 1141 (citing *Pennhurst*, 451 U.S. at 17). Then it found two of the same provisions lacking. First, the Tax Mandate provides no baseline to determine whether a State reduces tax revenue. *Id.* at 1144. And second, the "directly or indirectly offset" provision fails to provide the requisite clarity. *Id.* at 1145. As the unanimous panel found, "because money is fungible," the Treasury Defendants "can view any Rescue Plan funds received" as violating the indirect-offset provision. *Id.* at 1145. In effect, it provides no notice. So the Tax Mandate "is not ascertainable and does not provide clear notice about how to comply with it." *Id.* at 1146 (cleaned up).

The unanimous Eleventh Circuit panel also rejected the Treasury Defendants' argument that the "unambiguous" requirement is a mere rule of construction. *Id.* at 1141. It said that circuit precedent, Supreme Court precedent,

and "basic contract principles" each "independently demand" finding the Tax Mandate unconstitutional. *Id.* at 1141. In short, both the Eleventh Circuit panel and the Sixth Circuit panel unanimously found that the Tax Mandate lacks the required clarity.

**B.    The panel correctly found that the Tax Mandate is impermissibly vague and cannot be saved by Treasury's regulation.**

The Treasury Defendants' next two reasons for rehearing are not compelling for the simple reason that the panel correctly rejected these arguments. A quick recitation of the panel's reasoning is enough to dispense with them.

**1.** First, the Treasury Defendants claim that "Congress spoke with the clarity needed under *Pennhurst.*" Pet. 10. They cite *Cutter v. Wilkinson*, 423 F.3d 579, 586 (6th Cir. 2005), as requiring notice only that there are mandatory funding conditions, not requiring any clarity as to what those conditions might be. Pet. 11. But the panel chided the Treasury Defendants for "misreading" and "erroneously exaggerat[ing]" *Cutter. Kentucky*, 54 F.4th at 356. For starters, the parties in *Cutter* pressed an "anti-retroactivity" question, not a "strict-scrutiny-is-too-indeterminate" one. *Id.* Additionally, the portions of *Cutter* the Treasury Defendants quote—both here and before the panel—"were describing a *Seventh Circuit* decision." *Id.* The Treasury Defendants still "respectfully submit that *Cutter* quotes the

14

Seventh Circuit's reasoning with approval." Pet. 11 n.2. But as the panel noted, such language addressed a question not before the *Cutter* court. *Kentucky*, 54 F.4th at 356. Even if *Cutter* did stand for what the Treasury Defendants say it does (which it does not), the panel held that conditioning funding on complying with the well-known strict-scrutiny test is vastly more determinate than the Tax Mandate. *Id.*

Nor does the Treasury Defendants' claim that "Congress often uses the phrase 'directly or indirectly'" save the Tax Mandate. Pet. 13. The panel rejected that too. The examples the Treasury Defendants provide have "no conceivable relevance" to the Tax Mandate. *Kentucky*, 54 F.4th at 357. For instance, as the Treasury Defendants note, one rule makes it unlawful to make a false statement of material fact directly or indirectly. Pet. 13. But an example of doing that indirectly is easy to imagine—for instance, using "third-party intermediaries." *Kentucky*, 54 F.4th at 357. The panel found such examples "of no consequence" because "Treasury conceded that it has no example" of the directly-or-indirectly phrase "in a Spending Clause statute, much less one in the particular context of taxation, and, less still, one that survived ambiguity challenges in federal court." *Id.* Context is key, and the relevant phrase is "directly or indirectly *offset*." *Id.* (citing 42 U.S.C. § 802(c)(2)(A)). That phrase "occurs exactly *once* in the entire U.S.

Code"—in the Tax Mandate. *Id.* That statutes elsewhere use a subset of the phrase at issue here simply has "no conceivable relevance." *Id.* Neither case law nor the Treasury Defendants' examples save the Tax Mandate from its infirmity.

**2.** Second, the Treasury Defendants say Congress can "leave the particulars of implementing the condition to the agency charged with administering the spending program." Pet. 12. But the Tax Mandate does not include "the sort of particulars that . . . Congress can permissibly leave for an agency to resolve." *Id.* at 14. The Final Rule does much more than provide "implementation details"— it "supplied content without which" the Tax Mandate "literally could not function." *Kentucky*, 54 F.4th at 354. The Final Rule recognized as much: "Measuring a 'reduction' in net tax revenue requires identification of a baseline. In other words, a 'reduction' can be assessed only by comparing two amounts." 87 Fed. Reg. at 4,426. In essence, the Tax Mandate creates much too large a hole for the Final Rule to fill—an obligation too amorphous for the States to "voluntarily and knowingly accept[]." *Pennhurst*, 451 U.S. at 17.

Importantly, the Treasury Defendants admitted as much. They "categorically waived reliance on the [Final] Rule to cure a vagueness defect under the Spending Clause." *Kentucky*, 54 F.4th at 353. Both to the panel and to the district court, the Treasury Defendants conceded that "agency regulations should have *no*

*bearing* on the Spending Clause analysis." *Id.* (citation omitted). And the panel found that proper. It rejected the Treasury Defendants' invitation that the panel act "as if [it] were interpreting a statute which has no implications for the balance of power between the Federal Government and the States." *Id.* at 354 (citation omitted).

For this reason, the relevant question is not whether Congress can ever leave implementing details to agencies. *Contra* Pet. 14. The relevant question is whether Congress can leave *these* implementing details to the Treasury. And the unanimous answer to that question is "no." *See Kentucky*, 53 F.4th at 354; *West Virginia*, 59 F.4th at 1146.

### C.    The Treasury Defendants chose not to question the States' cause of action.

Finally, the Treasury Defendants briefly argue that the panel opinion "exceeds the bounds of the cause of action supported by the complaint." Pet. 9. But Judge Nalbandian's discussion of the States' cause of action is enough to reject this argument. Judge Nalbandian noted that the Supreme Court "has recognized an action in cases that allege Spending Clause violations under the Constitution itself." *Kentucky*, 54 F.4th at 362 n.4 (collecting cases). And Judge Nalbandian found it "telling[]" that the Treasury Defendants did "not contest the States' ability to sue apart from their justiciability arguments." *Id.* The Treasury

17

Defendants cannot now complain that the States "never even attempted to iden-tify a cause of action" when the Treasury Defendants forfeited that argument. Pet. 9–10. As the cases cited in the footnote show, the States have a cause of action under the Spending Clause. *Kentucky*, 54 F.4th at 362 n.4. The Court should dismiss this late-arising argument out of hand.

## CONCLUSION

The Court should deny rehearing.

Respectfully submitted by,

*s/Michael R. Wajda*
Daniel Cameron
  *Attorney General of Kentucky*
Matthew F. Kuhn
  *Solicitor General*
Michael R. Wajda
  *Assistant Solicitor General*

Office of the Kentucky
Attorney General
700 Capital Avenue, Suite 118
Frankfort, Kentucky 40601
(502) 696-5300
Matt.Kuhn@ky.gov
Michael.Wajda@ky.gov

*s/ Andrée S. Blumstein (with permission)*
Jonathan Skrmetti
  *Attorney General and Reporter of Tennessee*
Andrée S. Blumstein
  *Solicitor General*
J. Matthew Rice
  *Special Assistant to the Solicitor General*

Office of the Tennessee
Attorney General
P.O. Box 20207
Nashville, Tennessee 37202
(615) 741-3492
Andree.Blumstein@ag.tn.gov
Matt.Rice@ag.tn.gov

## CERTIFICATE OF COMPLIANCE

I certify that this response complies with the type-volume limitation in Fed. R. App. P. 35(b)(2)(A) and 35(e) because it contains 3,900 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and 6th Cir. R. 32(b)(1).

This response complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface, Garamond, in 15-point font using Microsoft Word.

*s/Michael R. Wajda*

## CERTIFICATE OF SERVICE

I certify that on March 27, 2023, I electronically filed this response with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit using the CM/ECF system. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*s/ Michael R. Wajda*